IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JANA KREINDEL,                                   No. 6:17-CV-00213-HZ

            Plaintiff,

      v.

NANCY A. BERRYHILL,                              OPINION & ORDER
Acting Commissioner,
Social Security Administration,

                  Defendant.


Bruce W. Brewer
LAW OFFICES OF BRUCE W. BREWER, PC
P.O. Box 421
West Linn, OR 97068

      Attorney for Plaintiff


Billy J. Williams
UNITED STATES ATTORNEY
District of Oregon
Renata Gowie
ASSISTANT UNITED STATES ATTORNEY
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902

Alexis L. Toma
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, WA 98104-7075

Attorneys for Defendant

HERNÁNDEZ, District Judge:

Plaintiff Jana Kreindel brings this action seeking judicial review of the Commissioner's final decision to deny disability insurance benefits (DIB). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). The Court affirms the Commissioner's decision.

## PROCEDURAL BACKGROUND

Plaintiff applied for DIB on August 24, 2009, alleging an onset date of January 1, 2008. Tr. 131-132. Her application was denied initially and on reconsideration. Tr. 67, 69–73 (Initial); Tr. 68, 75–78 (Reconsideration). On March 6, 2012, Plaintiff appeared with counsel for a hearing before an Administrative Law Judge (ALJ). Tr. 32–66. At the hearing, Plaintiff amended her alleged onset date to April 1, 2011. Tr. 36. On March 22, 2012, the ALJ found Plaintiff not disabled. Tr. 11–26. The Appeals Council denied review. Tr. 1–6.

On September 13, 2013, Plaintiff appealed the March 2012 ALJ decision to the District Court. On September 30, 2014, upon the stipulation of the parties, the District Court remanded the case for further administrative proceedings. Tr. 614–29.

On July 20, 2015, Plaintiff appeared with counsel for a new hearing. Tr. 578–608. At this second hearing, Plaintiff amended her alleged onset date again, to August 1, 2009. Tr. 590. On September 25, 2015, the new ALJ also found Plaintiff not disabled. Tr. 549–577. The Appeals Council again denied review. Tr. 521–24.

## FACTUAL BACKGROUND

Plaintiff alleges disability based on having endometriosis, irritable bowel syndrome, migraines, pan-hypopituitarism, musculoskeletal and abdominal pain, and fibromyalgia. Tr. 153, 586–87, 593, 596, 600–03. At the time of the July 2015 hearing, she was twenty-eight years old and not working. Tr. 584, 588. She holds a bachelor's degree and has past relevant work experience as a reservation clerk. Tr. 594, 605–06.

## SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which…has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(3)(a).

Disability claims are evaluated according to a five-step procedure. *See Valentine v. Comm'r*, 574 F.3d 685, 689 (9th Cir. 2009) (in social security cases, agency uses five-step procedure to determine disability). The claimant bears the ultimate burden of proving disability. *Id*.

At step one, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b).

At step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." *Yuckert*, 482 U.S. at 140–41; 20 C.F.R. §§ 404.1520(c), 416.920(c). If not, the claimant is not disabled.

At step three, the Commissioner determines whether plaintiff's impairments, singly or in combination, meet or equal "one of a number of listed impairments that the [Commissioner]

acknowledges is so severe as to preclude substantial gainful activity." *Yuckert*, 482 U.S. at 141;

20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if

not, the Commissioner proceeds to step four. *Yuckert*, 482 U.S. at 141.

At step four, the Commissioner determines whether the claimant, despite any

impairment(s), has the residual functional capacity (RFC) to perform "past relevant work." 20

C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can perform past relevant work, the claimant

is not disabled. If the claimant cannot perform past relevant work, the burden shifts to the

Commissioner.

At step five, the Commissioner must establish that the claimant can perform other work.

*Yuckert*, 482 U.S. at 141–42; 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f). If the

Commissioner meets his burden and proves that the claimant is able to perform other work

which exists in the national economy, the claimant is not disabled. 20 C.F.R. §§ 404.1566,

416.966.

THE ALJ'S DECISION

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful

activity since her alleged onset date through her date of last insured. Tr. 555. At step two, the

ALJ determined that Plaintiff has severe impairments of headache disorder, pan-hypopituitarism,

endometriosis, and obesity. *Id.* At step three, the ALJ determined that Plaintiff's impairments did

not meet or equal, singly or in combination, a listed impairment. Tr. 557.

At step four, the ALJ concluded that Plaintiff has the following RFC:

[T]hrough the date last insured, the claimant had the [RFC] to perform sedentary
work as defined in 20 C.F.R. § 404.1567(a) in which she stands, walks, or sits for
no more than six hours total each in an eight hour day, and lifts no more than 10
pounds occasionally, except that she can no more than frequently balance, kneel,
climb or crawl; occasionally crouch, stoop, and reach overhead; due to her history

of recurring headaches, she would function best in a low-stress work
environment, and so would be limited to simple, routine, repetitive tasks.

Tr. 558. With this RFC, the ALJ determined that Plaintiff is unable to perform any of her past

relevant work. Tr. 567.

At step five, the ALJ determined that Plaintiff is able to perform jobs that exist in

significant numbers in the economy such as sales and billing clerk, weight tester, and charge

account clerk. Tr. 568. Thus, the ALJ determined that Plaintiff is not disabled. *Id.*

STANDARD OF REVIEW

A court may set aside the Commissioner's denial of benefits only when the

Commissioner's findings are based on legal error or are not supported by substantial evidence in

the record as a whole. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). "Substantial

evidence means more than a mere scintilla but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal

quotation marks omitted). The court considers the record as a whole, including both the evidence

that supports and detracts from the Commissioner's decision. *Id.*; *Lingenfelter v. Astrue*, 504

F.3d 1028, 1035 (9th Cir. 2007). "Where the evidence is susceptible to more than one rational

interpretation, the ALJ's decision must be affirmed." *Vasquez*, 572 F.3d at 591 (internal

quotation marks and brackets omitted); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th

Cir. 2007) ("Where the evidence as a whole can support either a grant or a denial, [the court]

may not substitute [its] judgment for the ALJ's") (internal quotation marks omitted).

DISCUSSION

Plaintiff argues that the ALJ erred by: (1) failing to find that her fibromyalgia impairment

was severe at step two; and (2) improperly rejecting her credibility and subjective limitations

testimony.

I.      Step Two Fibromyalgia Assessment

Plaintiff contends that the ALJ committed reversible error by failing to find that her fibromyalgia impairment was severe at step two of the sequential analysis. The ALJ determined that no medical source diagnosed Plaintiff with fibromyalgia. Tr. 556. He observed that references to a fibromyalgia diagnosis primarily stemmed from Plaintiff's representation to her providers that she was given such a diagnosis in the past. *Id.* The ALJ noted that no independent attempts at establishing a fibromyalgia diagnosis were made. *Id.* The Court finds no error in the ALJ's conclusion.

The ALJ discussed the treatment notes of two physicians who came closest to—but stopped short of—making an actual fibromyalgia diagnosis. First, the ALJ acknowledged Dr. K. Annette Weller's opinion that Plaintiff's pain complaints and physical examination results "were 'strongly suggestive of a fibromyalgia syndrome.'" Tr. 556. However, the ALJ concluded that Dr. Weller based her opinion on Plaintiff's subjective pain complaints, and did not actually establish clinical findings consistent with fibromyalgia. *Id.* The record shows that Dr. Weller opined a few times that Plaintiff's chronic pain may be indicative of fibromyalgia. In October 2012, Dr. Weller noted that she "suspect[s] fibromyalgia with some additional localized myofascial pain contributing to [Plaintiff's] symptoms." Tr. 794. In January 2013, Dr. Weller reviewed with Plaintiff her opinion that Plaintiff's persistent and chronic pain "is related to a fibromyalgia syndrome." Tr. 793. Then in February 2013, Dr. Weller wrote that Plaintiff's "[o]ngoing pain complaints and physical examination was strongly suggestive of a fibromyalgia syndrome." Tr. 836. Nevertheless, the record does not reflect that Dr. Weller ever actually confirmed a diagnosis of fibromyalgia through actual and established testing. Thus, her strong suspicion never materialized into an actual diagnosis.

Second, the ALJ discussed the medical-opinion statement of Dr. Jean Edsall, in which Dr. Edsall mentioned that Plaintiff had fibromyalgia. Tr. 557. The ALJ noted, however, that Dr. Edsall based her statement on Plaintiff's self-report of a prior fibromyalgia diagnosis. *Id.* Furthermore, the ALJ noted Dr. Edsall's clarification that she neither did any testing to confirm the alleged diagnosis nor was an expert on fibromyalgia. *Id.* On April 2014, Dr. Edsall did state that Plaintiff had a "presumptive diagnosis" of fibromyalgia. Tr. 1115. However, as the ALJ observed, Dr. Edsall added the qualifier "presumptive" because she had not made the diagnosis herself, but rather relied on Plaintiff's own representation that Plaintiff "does have fibromyalgia." *Id.* Dr. Edsall opined that, "[s]ince [Plaintiff] seems to be tender anywhere I touch her, I think it is quite a likely diagnosis." *Id.* However, as the ALJ pointed out, Dr. Edsall later denied having actually tested Plaintiff for fibromyalgia, and disclaimed being an expert on the impairment. Tr. 1317, 1319. The ALJ reasonably concluded that Dr. Edsall never actually diagnosed Plaintiff with fibromyalgia.

In addition to the specific evidence that the ALJ cited in support of his finding that there was no fibromyalgia diagnosis, Dr. Cathleen Fritz noted in April 2012 that Plaintiff reported a history of fibromyalgia that "was not included in her [Electronic Medical Record]." Tr. 710. In June 2012, Plaintiff reported to Dr. Juanita Doerksen "that Dr. [James] Morris diagnosed her with fibromyalgia." Tr. 897. Dr. Doerksen "asked [Plaintiff] to get [] the notes from Dr. Morris to confirm this diagnosis." *Id.* There is no indication that Plaintiff provided any notes to Dr. Doerksen. And in contradiction to Plaintiff's June 2012 statement to Dr. Doerksen, her medical intake form in August 2012 had the following handwritten note: "fibromyalgia 09? – stabbing pain in ribs – *not diagnosed*[.]" Tr. 724 (emphasis added). *See also* Tr. 877 (Dr. Jennifer Di Francesco stating in February 2013: "I am not clear if [Plaintiff] has fibromyalgia").

Plaintiff argues that fibromyalgia "ha[d] been diagnosed in accordance with American College of Rheumatology [ACR] criteria." Pl.'s Br. 2. The Court understands Plaintiff to be referencing section II.A. of the Social Security Ruling (SSR) on the evaluation of fibromyalgia, which incorporates the ACR's "tender-point testing" criteria. *See* SSR 12-2p, 2012 WL 3104869 at *2 (July 25, 2012). Plaintiff then points out that Dr. Morris had found that she "ha[d] 14–15 out of 18 tender points and control points test negative." Pl.'s Br. 2 (citing Tr. 277). Nonetheless, Plaintiff does not assert that Dr. Morris actually diagnosed her with fibromyalgia. As discussed above, she only made this assertion to Dr. Doerksen. And such an assertion is not supported by the record. Even though Dr. Morris raised the possibility of fibromyalgia in treatment notes from November 11, 2009—"Also, [f]ibromyalgia needs to be considered"—under the "Current Diagnosis" section of the same record, he stated: "rule out incipient Fibromyalgia Syndrome (FMS)." Tr. 277. Dr. Morris's treatment notes from November 17, 2009, stated that a "[p]rior examination raised the question of diffuse allodynia/FMS as a possible explanation for [Plaintiff's] pain problem." Tr. 271. But again, under the "Assessment" heading, Dr. Morris noted "rule out incipient Fibromyalgia syndrome (FMS)." Tr. 271. At best, Dr. Morris opined that the *possibility* of fibromyalgia exists. The ALJ reasonably concluded that Dr. Morris never actually diagnosed Plaintiff with fibromyalgia.

In fact, Plaintiff's brief does not identify any physician who diagnosed her with fibromyalgia. Instead, Plaintiff conclusively asserts that she "meets the criteria for fibromyalgia under [Social Security Ruling] SSR 12-2p IIA and IIB." Pl.'s Br. 2. Plaintiff's perfunctory reading of SSR 12-2p overlooks the ruling's guidance that "a person has an MDI [medically determinable impairment] of FM [fibromyalgia] if [1] *the physician diagnosed FM* and provides the evidence [] described in section II. A. or section II. B., and [2] the physician's diagnosis is

not inconsistent with the other evidence in the person's case record." SSR 12-2p, 2012 WL 3104869 at *2 (July 25, 2012) (emphasis added). As discussed above, there has been no fibromyalgia diagnosis. Plaintiff is essentially assigning error to the ALJ's refusal to fill the diagnostic void with the ALJ's own diagnosis. But an ALJ's task is not to make medical diagnoses where Plaintiff's own physicians have declined to do so. The ALJ did not err by finding that Plaintiff's alleged fibromyalgia was not severe.

Even assuming, *arguendo*, that the ALJ erred by failing to find that Plaintiff's fibromyalgia impairment was severe, the error is harmless. "In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996). Therefore, a reversible error occurs only if the ALJ did not account for step-two "non-severe" impairments in determining a claimant's RFC. *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (holding that where the ALJ considered evidence of limitations posed by claimant's bursitis at step four of the disability analysis, any error in failing to consider bursitis "severe" at step two was harmless). Here, in determining Plaintiff's RFC, the ALJ "considered *all* symptoms and the extent to which the[] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence[.]" Tr. 558 (emphasis added). Specifically, the ALJ took into account Plaintiff's "overall pain, whether from headaches or any other source *including her poorly documented fibromyalgia*, myofascial pain, or orthopedic impairments." Tr. 565 (emphasis added).

Moreover, at step two, the ALJ found that Plaintiff had other severe impairments, namely headache disorder, pan-hypopituitarism, endometriosis, and obesity. Tr. 555. The Ninth Circuit has held that, where "step two was decided in [the Plaintiff's] favor…[she] could not have

possibly been prejudiced." *Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017). Plaintiff does

not contend that the ALJ omitted any particular limitations from the RFC calculation.

Accordingly, any error by the ALJ for not finding that Plaintiff's fibromyalgia was severe would

be harmless because the ALJ incorporated limitations caused by the impairment into the RFC

calculation, and Plaintiff does not challenge the assessment.

II.     Credibility Determination

The ALJ is responsible for determining credibility. *Vasquez*, 572 F.3d at 591. Once a

claimant shows an underlying impairment and a causal relationship between the impairment and

some level of symptoms, clear and convincing reasons are needed to reject a claimant's

testimony if there is no evidence of malingering. *Carmickle v. Comm'r*, 533 F.3d 1155, 1160

(9th Cir. 2008) (absent affirmative evidence that the plaintiff is malingering, "where the record

includes objective medical evidence establishing that the claimant suffers from an impairment

that could reasonably produce the symptoms of which he complains, an adverse credibility

finding must be based on 'clear and convincing reasons'"); *see also Molina v. Astrue*, 674 F.3d

1104, 1112 (9th Cir. 2012) (ALJ engages in two-step analysis to determine credibility: First, the

ALJ determines whether there is "objective medical evidence of an underlying impairment which

could reasonably be expected to produce the pain or other symptoms alleged"; and second, if the

claimant has presented such evidence, and there is no evidence of malingering, then the ALJ

must give "specific, clear and convincing reasons in order to reject the claimant's testimony

about the severity of the symptoms") (internal quotation marks omitted).

When determining the credibility of a plaintiff's complaints of pain or other limitations,

the ALJ may properly consider several factors, including the plaintiff's daily activities,

inconsistencies in testimony, effectiveness or adverse side effects of any pain medication, and

relevant character evidence. *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995). The ALJ may also consider the ability to perform household chores, the lack of any side effects from prescribed medications, and the unexplained absence of treatment for excessive pain. *Id.*; *see also Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) ("The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities") (internal quotation marks omitted).

As the Ninth Circuit explained in *Molina*:

> In evaluating the claimant's testimony, the ALJ may use ordinary techniques of credibility evaluation. For instance, the ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct, unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment, and whether the claimant engages in daily activities inconsistent with the alleged symptoms[.] While a claimant need not vegetate in a dark room in order to be eligible for benefits, the ALJ may discredit activities indicating capacities that are transferable to a work setting[.] Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.

*Molina*, 674 F.3d at 1112–13 (citations and internal quotation marks omitted).

The ALJ found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible. Tr. 567. The factors that the ALJ considered in weighing Plaintiff's credibility sort into four categories: (1) secondary gain/drug-seeking behavior; (2) medical noncompliance; (3) activities inconsistent with alleged incapacitation; and (4) ordinary techniques of credibility evaluation.

///

### A. Secondary Gain/Drug-Seeking Behavior

First, the ALJ found that claimant's credibility is undermined by indications that secondary gain is likely. Tr. 558. The Court's reading of the ALJ's decision and the record suggests that here, the ALJ used "secondary gain" as an alternative expression for "drug-seeking." Drug-seeking behavior is a clear and convincing reason to discount a claimant's credibility if supported by substantial evidence. *See Edlund v. Massanari*, 253 F.3d 1152, 1157 (9th Cir. 2001) (holding that drug-seeking behavior is evidence that undermines a claimant's credibility). The ALJ highlighted Plaintiff's interaction with several different medical providers in eight different instances to support his "secondary gain, drug-seeking behavior" rationale. The Court finds that the ALJ's rationale is supported by substantial evidence in the record.

To begin, the ALJ discussed Dr. Morris's treatment notes. Tr. 558. He gave considerable weight to Dr. Morris's impression that Plaintiff "has an agenda she is not sharing." *Id.* Dr. Morris also suggested the likelihood of "elements of secondary gain" in discussing Plaintiff's symptom-management challenges. Tr. 277. These observations cumulated into Dr. Morris's prediction that Plaintiff "will reject all multidisciplinary modalities for one reason or another, including valid financial concerns, and will continue to *focus on receiving opioids as the easiest option to deal with her pain and mood*." *Id.* (emphasis added). Dr. Morris also expressed concerns that "personality factors may make it difficult to prescribe [opioid therapy] safely and effectively." Tr. 278. The ALJ may reasonably conclude from the treatment notes that Plaintiff exhibited drug-seeking behavior, especially when Plaintiff's physician effectively said as much.

Next, the ALJ cited Plaintiff's August 18, 2009,[1] appointment with Dr. Galen Griffin. Tr. 559. The ALJ noted that Plaintiff specifically requested a prescription for morphine, which Dr.

---

[1] The ALJ mistakenly stated that the appointment was on August 10, 2009. There is no corresponding appointment in the records.

Griffin declined. *Id.* The ALJ also considered Dr. Griffin's opinion that Plaintiff's pain level did not warrant any more aggressive or excessive amount of pain medication. *Id.* The ALJ accurately recited the record. According to Dr. Griffin, Plaintiff claimed that morphine was "the only thing that really relives [*sic*] her pain[.]" Tr. 254. Plaintiff also told Dr. Griffin that she visited the emergency room three times in the preceding two weeks. *Id.* Yet Dr. Griffin observed that Plaintiff appeared to sit comfortably at the appointment. *Id.* Dr. Griffin concluded that her office had exhausted its options regarding Plaintiff's pain, and Plaintiff's remaining option is to "present herself back to the emergency room" "[i]f she feels she cannot function[.]" *Id.* But Dr. Griffin added that Plaintiff "obviously does not meet admission criteria at this point, however." *Id.* Considering Dr. Griffin's judgment that a morphine prescription was not warranted despite Plaintiff's insistence, it was reasonable for the ALJ to infer drug-seeking behavior from the described instance.

Furthermore, the ALJ observed that this instance took place concurrently with Dr. Morris suspecting that Plaintiff had a "secondary gain" motive. Tr. 559. Dr. Morris's treatment note suggesting "secondary gain" came from an appointment on November 11, 2009. Tr. 277. Although "concurrent" may be a somewhat liberal characterization of the three-month span between the two appointments, the ALJ may reasonably conclude that the circumstances together evince drug-seeking behavior.

Additionally, the ALJ cited a similar instance that occurred on January 18, 2011.[2] Tr. 559. Visiting again with Dr. Griffin, Plaintiff complained of back pain and requested a prescription for Dilaudid. Tr. 454. But as the ALJ noted, Dr. Griffin found Plaintiff to be in no real significant pain and declined her request. *Id.* Although Plaintiff claimed that she was in the

---

[2] The ALJ mistakenly stated that the appointment was on January 19, 2011. There is no corresponding appointment in the records.

emergency room just the previous night and was given Dilaudid, Dr. Griffin not only declined the Dilaudid request, she also declined Plaintiff's MRI request. *Id.* Again, the ALJ reasonably concluded that Plaintiff exhibited drug-seeking behavior.

The ALJ also found Plaintiff's May 13, 2011, description of nerve pain extending throughout the right side of her body to be implausible. Tr. 559. He also noted Dr. Griffin's advice that narcotics use was inappropriate. *Id.* Moreover, the ALJ compared Plaintiff's severe-pain complaint and narcotics requests made to Dr. Griffin to Plaintiff's representation at an appointment with Dr. Kathleen Wilken only one month later that ibuprofen alone provided near-complete pain relief. *Id.* The ALJ noted the events' proximity in time. *Id.* The ALJ accurately described the record, and under the same rationale as discussed above, the ALJ reasonably concluded that Plaintiff exhibited drug-seeking behavior.

Next, the ALJ cited Plaintiff's March 26, 2012, appointment with Dr. David Strutin.[3] Tr. 559. Plaintiff initially visited Dr. Strutin regarding back pain caused by slipping and falling in the snow. Tr. 1164. She transitioned to asking for a Dilaudid injection to manage her chronic pain problems. *Id.* Dr. Strutin declined, opining, "there was no indication for her to receive parenteral narcotic analgesic for [the current acute condition]." *Id.* Instead, he recommended that she reestablish primary care with her provider. *Id.* The ALJ noted Dr. Strutin's observation that Plaintiff was quite dissatisfied with the recommendation. Tr. 559.

In addition, the ALJ cited Plaintiff's October 22, 2013, appointment with Dr. Edsall. *Id.* Plaintiff told Dr. Edsall that only injections of Toradol or Dilaudid relieved her headache. Tr. 1148. Dr. Edsall stated that she "would prefer not to get started down the road of opioid pain medications." *Id*. In light of Plaintiff's past direct requests for narcotic drug prescriptions, the ALJ reasonably inferred that Plaintiff's mention of Dilaudid was tantamount to an explicit

---

[3] The ALJ mistakenly identified him as Dr. David "Struttin" in the hearing decision.

request that Dr. Edsall prescribe Plaintiff the drug. The ALJ also discussed Plaintiff's November 27, 2013, appointment, at which Plaintiff requested that Dr. Edsall refill her Xanax prescription. *Id.* Plaintiff claimed that a previous provider, who no longer treated her, had originally prescribed her the drug. Tr. 1139. Dr. Edsall conditionally agreed to prescribe a small amount, but required Plaintiff to receive further specialized treatment. *Id.*

Finally, the ALJ cited Plaintiff's December 30, 2014, appointment, at which Plaintiff requested pain medication for ankle pain. Tr. 559. Although Dr. Edsall's treatment note did not indicate whether Plaintiff specified a particular pain medication, Dr. Edsall's subsequent statement that she "did not think it appropriate to use opioid pain medication for this condition" implies that Plaintiff sought opioids. Tr. 1083. Considering Plaintiff's repeated attempts to procure narcotic drug prescriptions from her medical providers, and the medical providers' near-uniform rebuff because they determined that such prescriptions were unwarranted, the ALJ reasonably concluded that Plaintiff demonstrated drug-seeking behavior.

Plaintiff argues that the ALJ erred by relying on the physicians' judgment that prescribing narcotic pain medication was unwarranted. Plaintiff correctly states, and the ALJ acknowledged as an initial matter, that fibromyalgia does not lend itself to objective evaluation. Pl.'s Br. 4; Tr. 558. Therefore, Plaintiff urges, "[i]t was improper as a matter of law [] for the ALJ to undermine Plaintiff's credibility on the ground that doctors would not prescribe narcotic pain medication because the objective findings did not support the subjective complaints." Pl.'s Br. 4. In support, Plaintiff cites *Benecke v. Barnhart*, 379 F.3d 587, 594 (9th Cir. 2004). However, *Benecke* does not stand for the proposition that Plaintiff contends. In *Benecke*, the plaintiff had an actual fibromyalgia diagnosis and the ALJ simply "rel[ied] on his disbelief of Benecke's symptom testimony as well as his misunderstanding of fibromyalgia" to discount the

claimant's credibility. *Id.* The *Benecke* ALJ erred by requiring "objective" evidence *beyond* the medical opinions. *Id.* The instant case is distinguishable because the ALJ *relied* on the medical opinions that narcotics were not warranted and that Plaintiff exhibited drug-seeking behavior. Plaintiff effectively argues that the ALJ erred because he did not overrule the treating physicians' observations with his own contrary conclusion. Plaintiff's argument is unavailing. The ALJ's finding that Plaintiff was not fully credible because of "secondary gain" or "drug-seeking behavior" is supported by substantial evidence in the record.

### B.       Medical Noncompliance

Second, the ALJ discounted Plaintiff's credibility because of her pattern of medical noncompliance. Noncompliance with medical treatment is a clear and convincing reason to reject a claimant's testimony. *Tommasetti*, 533 F.3d at 1039; *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005); *Fair v. Bowen*, 885 F.2d 597, 603–04 (9th Cir. 1989). Here, the ALJ remarked that Plaintiff was particularly noncompliant when alternatives to narcotic analgesics were offered. Tr. 560. The ALJ further found Plaintiff to be noncompliant when she restarted hormone therapy without medical consultation, resisted injections for fatigue symptoms, and disregarded two doctors' recommendations that she wear a medical alert device. *Id.* The ALJ properly relied on Plaintiff's noncompliance with medical treatment to discredit her subjective symptom testimony.

The ALJ's "medical noncompliance" conclusion is supported by substantial evidence in the record. Dr. Morris described Plaintiff as "not willing to try recommended pharmaceuticals and [] reluctant to try time-contingent, long acting opioid therapy." Tr. 271. Dr. Morris also commented on Plaintiff's unwillingness "to consider reasonable adjuvants[.]" *Id.* On one occasion, Dr. Morris noted that she flushed some prescribed medication and refused to take others. Tr. 269. Dr. Morris considered Plaintiff "a poor candidate for opioids due to her non-

cooperative nature." Tr. 271. Plaintiff's non-cooperative nature led Dr. Morris to predict that Plaintiff "will not return here because of the requirements we shape around the use of opioids and her disinterest in multidisciplinary treatment efforts." Tr. 272.

Other doctors observed the same noncompliant behavior. Dr. Richard Marcus noted Plaintiff's inappropriate use of Zanaflex for sleep. Tr. 1018. Dr. Edsall remarked that Plaintiff had been "poor at following the exercise routine and activity instructions provided in physical therapy." Tr. 952. Dr. Aaron Pardini asked Plaintiff to call once she received her growth hormone so they could "go over [] how to titrate her dose[.]" Tr. 901. But Plaintiff "unfortunately did not contact [them] and decided to start her growth hormone on her own." *Id.* Dr. Pardini opined that the Plaintiff's noncompliance caused the "extreme hot and cold flashes, palpitations, frequent nausea, and insomnia" about which she subsequently complained. *Id.*

Finally, Dr. Susan Sanderson noted Plaintiff's resistance to her suggestion of daily GH injections to treat fatigue symptoms. Tr. 1048. Dr. Sanderson also expressed that she was "quite concerned about [Plaintiff's] disregard of Dr. Allison's and [her] recommendations [that Plaintiff] wear medical alert bracelet or necklace, as she is at very high risk of serious morbidity and mortality if secondary adrenal insufficiency and DI are unrecognized." *Id.* In light of the significant risks associated with Plaintiff's refusal, and in the absence of any explanation by Plaintiff as to why she refused, the ALJ reasonably concluded that Plaintiff was medically noncompliant.

### C. Activities Inconsistent with Alleged Incapacitation

Third, the ALJ found that Plaintiff was not fully credible because Plaintiff's activities were inconsistent with her alleged incapacitation. The ALJ noted Plaintiff's work, ability to engage in routine activities, and completion of baccalaureate studies during her alleged period of

disability. Tr. 561. Even though Plaintiff testified that she last worked or attempted to work in December 2009, the ALJ pointed to the statement Plaintiff made to Dr. Weller in September 2012 that she had been working as a nanny. Tr. 560, 592.

Additionally, the ALJ cited Plaintiff's description of her routine activities. Tr. 561. Plaintiff testified that she does upkeep of her apartment, cleaning, laundry, meal preparation, and household chores, with intermittent breaks. Tr. 596. Plaintiff also testified to driving herself to the hearing, to doctor appointments, to visit her mother, and to the grocery store, where she shops for herself. Tr. 597. "[T]he mere fact that a plaintiff has carried on certain daily activities…does not in any way detract from her credibility as to her overall disability. One does not need to be 'utterly incapacitated' in order to be disabled." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) (citing *Fair*, 885 F.2d at 603). However, here, Plaintiff testified to not working because "extreme muscle pain, fatigue, migraines, abdominal pain, and nausea" subjected her to spending most of her days sleeping, lying in bed, and watching TV. Tr. 596. The ALJ reasonably concluded that, based on testimony of such a level of incapacitation, Plaintiff's activities exceeded what would be expected of her.

Finally, the ALJ considered Plaintiff's ability to complete her associate's and bachelor's degrees since she first applied for disability benefits. Tr. 561–62. Although Plaintiff testified that she conducted all her studies online and with medically approved extensions, the ALJ still found her ability to complete college-level coursework on a regular and continuing basis to be inconsistent with the debilitating conditions that Plaintiff alleged. *Id.*; Tr. 593–94. The ALJ's conclusion that Plaintiff's allegations of extreme and widespread pain would have had a more prohibitive effect on Plaintiff's studies, even considering her accommodations, was a reasonable interpretation of the record.

### D. Ordinary Techniques of Credibility Evaluation

Fourth, the ALJ discounted Plaintiff's credibility based on ordinary techniques of evaluation. These include, but are not limited to, "the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid[.]" *Tommasetti*, 533 F.3d at 1039. The ALJ considered Plaintiff's false report to Dr. Doerksen that Dr. Morris had diagnosed her with fibromyalgia. Tr. 558. The ALJ also noted Plaintiff's inconsistent symptom descriptions to two different doctors at appointments in close proximity in time. Tr. 559. He gave considerable weight to Dr. Weller's observation that, "[w]hen not specifically tested, [Plaintiff displayed a] range of motion in rotation…greater than that with testing." Tr. 787. Dr. Weller also expressed concern with Plaintiff's "more generalized complaints of pain with very high ratings despite the fact [that Plaintiff] sits comfortably and appears to move fairly comfortably." Tr. 788. Dr. Weller found the "[i]nconsistencies during the examination concerning." *Id.*

The ALJ also discussed multiple symptom statements Plaintiff made at the hearing that were inconsistent with the records. Tr. 560. Plaintiff claimed that abdominal pain in August 2008 confined her to bed—"I couldn't even move. I was in bed in a fetal position"—but a review of concurrent treatment notes did not reveal comparable pain complaints. Tr. 586. Plaintiff explained that she could not seek fibromyalgia treatment because her insurance did not cover treatment by pain specialists. Tr. 602. However, the ALJ pointed out that Plaintiff was treated by Dr. Morris, a pain specialist. Tr. 560. The ALJ also contrasted Plaintiff's claim that her thyroid level was always too high or too low with medical records indicating that proper hormone therapy stabilized the condition. *Id.* He rejected Plaintiff's testimony that rheumatologists would not treat her because she did not have rheumatoid arthritis. *Id.*

Furthermore, the ALJ noted Plaintiff's inconsistent testimony regarding her disability onset date and her employment record. Tr. 561. The ALJ recited the three onset-date amendments that Plaintiff made, described her inability to recall basic facts, and observed her unwillingness to admit that she knew about the first onset-date amendment. *Id.* In addition, the ALJ noted Plaintiff's failure to mention her unemployment benefits. *Id.* Plaintiff argues that receiving unemployment benefits "does not diminish her credibility." Pl.'s Br. 5. However, the ALJ did not discount Plaintiff's credibility because she was an unemployment-benefits recipient. The ALJ cited Plaintiff's testimony regarding unemployment benefits to show that Plaintiff displayed a general lack of candor. Based on ordinary techniques of evaluation, the ALJ reasonable concluded that Plaintiff was not fully credible.

The ALJ offered clear and convincing reasons for discounting Plaintiff's testimony, namely: (1) secondary gain/drug-seeking behavior; (2) medical noncompliance; (3) activities inconsistent with alleged incapacitation; and (4) ordinary techniques of credibility evaluation. Because substantial evidence in the record support the ALJ's negative credibility determination, the Court finds no reversible error.

## E.    Specificity

Plaintiff argues that the ALJ failed to specify which of her complaints the ALJ was undermining for the reasons that the ALJ cited. Pl.'s Br. 4. The ALJ must give "specific, clear and convincing reasons in order to reject the claimant's testimony about the severity of the symptoms." *Molina*, 674 F.3d at 1112 (internal quotation marks omitted). Because the ALJ did specify the multiple instances in which he found Plaintiff's testimony to be less than credible, the Court finds no merit in Plaintiff's argument.

For example, the ALJ discussed Plaintiff's false statement that Dr. Morris had diagnosed her with fibromyalgia. Tr. 558. The ALJ also noted Plaintiff's claim that her insurance did not cover treatment by pain specialists, yet Plaintiff was seeing Dr. Morris, a pain specialist. Tr. 560. Additionally, the ALJ contrasted Plaintiff's testimony that she stopped working in December 2009 with Plaintiff's admission to Dr. Weller in September 2012 that she had been working as a nanny. *Id.* Furthermore, the ALJ discredited Plaintiff's claim that she was bedridden by pain in light of Plaintiff's ability to engage in routine daily activities. Tr. 560–61. The ALJ's discussion amounted to substantially more than a "'vague allegation' that [Plaintiff's] testimony is 'not consistent with the objective medical evidence[.]" *Treichler v. Comm'r*, 775 F.3d 1090, 1103 (9th Cir. 2014) (citing *Vasquez*, 572 F.3d at 592) (assigning error to the ALJ's dismissal of Plaintiff's credibility with a "single general statement"). The ALJ's findings are sufficiently specific, numerous, and detailed.

## CONCLUSION

The Commissioner's decision is affirmed.

IT IS SO ORDERED.

Dated this ____ day of _____, 2018.


_____
MARCO A. HERNÁNDEZ
United States District Judge